25 F.3d 1512
 TURNER ENTERTAINMENT CO., Plaintiff-Appellee,
v.
DEGETO FILM GmbH; Norddeutscher Rundfunk; Hessischer
Rundfunk; Radio Bremen; Saarlandischer Rundfunk; Sender
Freies Berlin; Suddeutscher Rundfunk; Sudwestfunk and
Westdeutscher Rundfunk, Defendants-Appellants.
 No. 93-9181.
 United States Court of Appeals,
Eleventh Circuit.
 June 29, 1994.
 
 Joseph R. Bankoff, King & Spalding, Atlanta, GA, for appellants.
 John J. Dalton, Troutman Sanders, Atlanta, GA, for appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before ANDERSON and BIRCH, Circuit Judges, and ATKINS*, Senior District Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 This is an appeal of (1) the district court's grant of a preliminary injunction to plaintiff-appellee Turner Entertainment Co. ("Turner"), preventing defendants-appellants from broadcasting certain licensed works over the ASTRA satellites, and (2) the district court's denial of appellants' motion to dismiss or stay the American litigation in light of parallel proceedings under way in Germany. In the intervening period between the grant of the preliminary injunction and argument on this appeal, a judgment on the merits was rendered in the action in Germany. The German court found that the appellants should be able to broadcast via ASTRA for an increased fee to be determined at a later date. In light of this foreign judgment, we must decide whether to defer to the German court's judgment and dismiss or stay this action, or to ignore the German decision and continue essentially parallel proceedings. We hold that the preliminary injunction should be vacated, and that a stay of the American litigation is warranted.
 
 I. FACTS AND PROCEEDINGS BELOW
 
 2
 This case involves a dispute over the interpretation of a License Agreement (the "Agreement") between the parties. The Agreement licensed certain entertainment properties to the appellants for television broadcast to the German population. Rapid changes in geopolitics and television technology since the inception of the Agreement led to the instant dispute over the limits of the contract.
 
 A. The Parties
 
 3
 Defendant Degeto Film GmbH ("Degeto") is the exclusive agent for the other defendants. The remaining defendants are German public broadcasters; each serves one of the German political states (the "Lander"). Together the broadcasters, along with three other companies not a party to the American litigation, form a cooperative known as the Arbeitsgemeinschaft der offentlich rechtlichen Rundfunkanstalten der Bundesrepublik Deutschland ("ARD"). The defendants-appellants are collectively referred to in this opinion as ARD. ARD is supported by mandatory royalty fees and is obligated by German law to provide programming to the entire German population.
 
 
 4
 Although Degeto signed the Agreement with MGM/UA in 1984, Turner acquired the rights, through a series of transactions in the 1980's, to a substantial majority of the MGM/UA licensed properties covered by the Agreement. Thus, Turner purchased the rights and obligations under the Agreement as it pertains to those properties, and now stands in the shoes originally filled by MGM/UA.
 
 B. The Agreement
 
 5
 ARD paid at least $60 million for an exclusive license to telecast the licensed works, under German copyright, to the German-speaking public, only in the German language. The licensed works include many old MGM movies, television series and cartoons. The Agreement expressly allows ARD to telecast the licensed works for reception within the licensed territory "by all means and methods now or hereafter known including but not limited to ... DBS [direct broadcasting satellite] and/or communication satellite for purposes of so-called home television reception," so long as the works are broadcast in German. The licensed territory comprises virtually all of German-speaking Europe--the German Democratic Republic, the Federal Republic of Germany, German-speaking Switzerland, Austria, South Tyrol (a region in Italy), Liechtenstein and Luxembourg.
 
 
 6
 The Agreement states that the telecasts can originate in any place in the universe, but only for reception within the territory. Because the reception area, or "footprint," of satellite broadcasts does not easily conform to the political and cultural boundaries that comprise the licensed territory, the parties included an exception to the strict definition in the contract of the licensed territory. Thus, the contract states that "[t]he telecast can originate any place in the universe for reception only in the Territory as defined ... below (inclusive of legitimate overspill as set forth in Paragraph 2(f) below)." The meaning of the term "overspill" generally, its applicability to ARD and/or ASTRA[1] broadcasts, and the result that should obtain based on such determinations, has been a hotly contested issue in the litigation. Despite the importance of the term to the contract, no clear explanation of the meaning and scope of overspill exists in the contract. Paragraph 2(f) contains only a contextual definition of overspill and states in relevant part:
 
 
 7
 Licensees acknowledge that broadcasts by satellite or otherwise in any language originating outside of the Territory might be received by television sets inside the Territory and that such reception shall not be deemed a breach hereof by MGM/UA. Further, notwithstanding the foregoing, if the overspill into the Territory is a result of compliance by MGM/UA's licensees with international conventions or treaties, including but not limited to the 1977 Geneva Convention, binding upon that licensee's territory, the licensee shall not be deemed to be in breach of its agreement with MGM/UA. In the event of illegitimate overspill into the Territory, Degeto shall notify MGM/UA and MGM/UA shall notify the entity whose signal is encroaching into the Territory to cease and desist from such encroaching activity.... MGM/UA shall provide in its own future standard license agreements that MGM/UA's licensees are prohibited from directing their signal into the Territory and from allowing their signal unintentionally to encroach into the Territory (except as to legitimate overspill as set forth above)....
 
 
 8
 Nothing more exists in the Agreement to define overspill.
 
 
 9
 In 1986 Degeto and MGM/UA amended the Agreement. The 1986 amendment, among other things, gave ARD the right to telecast certain licensed properties in English. English telecasts could not be broadcast, however, by DBS satellite, which at that time was the standard method for satellite broadcasting. The 1986 amendment also provided that "[t]he place of jurisdiction and applicable law with respect to disputes arising out of this Agreement shall only be (a) Frankfurt, Germany and/or (b) Los Angeles, California or such other city in the USA in which MGM/UA's parent company maintains its primary place of business." Thus, the seeds of the instant parallel litigation were planted in the Agreement, which provided for concurrent jurisdiction in Frankfurt, and, as a result of Turner's acquisition of the contract rights, Atlanta.[2]
 
 
 10
 C. Technological and Geopolitical Changes Since the Agreement's Inception
 
 
 11
 ARD began broadcasting licensed works from Germany, in German, via the ASTRA 1B satellite in April of 1991. ARD maintains that it chose the ASTRA 1B satellite as a means of telecasting programming because (1) a substantial part of the former East German households, absorbed into the Federal Republic of Germany since the Agreement was drafted, can only receive television programming via satellite, apparently because of its poor communications infrastructure;[3] and (2) there were no other satellites that Defendants could effectively use to reach the German-speaking television audience, which ARD is obligated to do by German law, because satellite dishes designed to receive the ASTRA signal are more common in Germany.
 
 
 12
 The ASTRA 1B is an FSS satellite, which means that it operates in the "fixed satellite service." Although the footprint of a DBS satellite could be as large as that of the ASTRA 1B, there are significant differences between the two satellites such that television reception of ASTRA 1B covers a much larger area. Relatively new technological developments have increased the sensitivity of common home satellite dish antennae and receivers, enabling FSS satellite signals to be received by anyone with a satellite dish in the satellite's service area. In contrast, DBS satellites require expensive decoding equipment that prohibit the common viewer from receiving its signals. Thus, the FSS satellite has revolutionized European television by allowing broadcasters to easily send their signal directly to viewers who own relatively inexpensive satellite reception dishes. Apparently, the home satellite dish is a more popular mode of television reception in Europe, compared to cable television, than in the U.S. The ASTRA 1B has a footprint over five times the size of the licensed territory; the footprint encompasses most of Europe. ASTRA 1B, therefore, is a prime vehicle for reaching a large European television audience. The Agreement's drafters failed to anticipate that such an easy method of reaching a pan-European audience would become a standard mode of broadcasting during the life of the Agreement.
 
 
 13
 D. The Dispute--Proceedings in Germany and Atlanta
 
 
 14
 In March 1993, Turner learned that ARD intended to broadcast its major program, "Das Erste," a program which apparently incorporates the use of licensed works, over ASTRA 1B in August 1993. Turner stated its opinion that transmitting licensed works via ASTRA violates the Agreement. After a flurry of communication between the parties, in which Turner attempted to prevent broadcasts via ASTRA and ARD refused Turner's requests, actions were filed by the parties within a week of each other in Germany and the United States. The German and American lawsuits proceeded concurrently.
 
 
 15
 1. The German proceedings.
 
 
 16
 The appellants filed a declaratory judgment action against Turner in Germany, on April 29, 1993, seeking judicial support for their interpretation that the Agreement permitted the use of ASTRA 1B. The German action was filed in a German court of first consideration, the Landgericht Frankfurt am Main.
 
 
 17
 One of the key issues in the litigation concerned the term "overspill," namely, whether (1) overspill applied to the reception of ARD broadcasts outside the licensed territory, (2) whether overspill applied to FSS satellites so that the ASTRA footprint created overspill, and (3) if overspill did apply to the use of ASTRA, whether the overspill of ASTRA's signal was legitimate. The appellants maintained that the oversized footprint of ASTRA 1B comports with the Agreement because overspill as defined in the Agreement applies reciprocally to licensee and licensor,[4] and that the overspill of ASTRA 1B is legitimate because (1) the broadcasts are in German and the licensed territory encompasses all viable markets for German television, rendering the overspill of German-language programming harmless, and (2) ARD receives no profit from the broadcasts.
 
 
 18
 The appellants made an alternative argument in the German court that the term overspill as used in the Agreement contemplated neither the new technology of FSS satellites nor the necessity of using them in order to obey the legal mandate that ARD reach the entire German population, and therefore that a gap exists in the contract. Appellants invited the German court to fill the gap in the contract, using the German doctrine of supplemental interpretation, by allowing ARD to broadcast Turner-licensed works via ASTRA, or alternatively to allow the broadcasts on ASTRA subject to the payment of an increased fee.
 
 
 19
 Turner argued that the Agreement's proviso allowing overspill did not apply reciprocally to licensee and licensor.[5] Therefore, according to Turner's interpretation of the Agreement, Turner and its licensees outside Germany can overspill into the licensed territory, but ARD is strictly limited to broadcasting within the territory, and cannot overspill outside the licensed territory. Turner also made an alternative argument to the German court that a gap in the contract existed concerning the present state of affairs in European television; however, contrary to the appellants' proposal, Turner invited the German court to fill the gap by disallowing the use of ASTRA 1B.
 
 
 20
 The German court heard argument on the merits of the declaratory judgment action in Germany, and rendered a judgment on the merits on November 25, 1993. The German court held that because of its extensive range, ARD had no absolute right under the Agreement to broadcast via ASTRA. App. to Supp. Brief of Appellants, Tab 4, 23-24. However, the court found that the parties had not contemplated the current circumstances involving the new technology and the fact that ARD was compelled as a practical matter to broadcast outside the licensed territory in order to fulfill its legal obligation to bring its telecasts to the German public. Id. at 24-27. Given this gap in the operation of the contract, the German court determined that it was bound to apply the doctrine of good faith dealing to the situation. Id. at 25. The court attempted a supplemental interpretation of the contract to determine a result that parties bargaining in good faith would have negotiated.
 
 
 21
 The German court determined that Turner should permit ARD to use the satellite in order to properly fulfill its legal obligations. Id. at 29. However, the court determined that ARD would have to pay an increased fee for the privilege, to be determined by that court at a later date. Id. at 30. The German court relied on several factors in making this decision. The court noted that Turner had not envisioned concretely any additional licensing of German-language programming outside the licensed territory. Id. at 29. Also, the court noted that the licensed territory covers such a large proportion of the German-speaking public that, in its opinion, no significant economic interest of Turner was obliterated by ASTRA. Id. More importantly, the court emphasized (1) the wide distribution of ASTRA reception equipment in the license territory, making ASTRA the best method for reaching a wide audience, and (2) the statutory mandate for ARD to reach the German public; and determined that the just result was the payment of increased fees in exchange for the privilege of broadcasting via ASTRA. Id. Both parties have appealed the German decision, and Turner obtained a delay in the fee hearings pending the German appeal.
 
 
 22
 2. The Atlanta Proceedings.
 
 
 23
 Turner filed the instant breach of contract action approximately one week after the German action was filed, on May 6, 1993, in Fulton County Superior Court. Appellants removed, based on diversity, to the United States District Court for the Northern District of Georgia. Turner sought a preliminary and permanent injunction and damages caused by Defendants' alleged breach. The appellants countered with a motion to dismiss or stay the American proceedings in deference to the parallel proceedings in Germany.
 
 
 24
 At the time of the June 29, 1993, hearing on the motion for preliminary injunction and the motion to dismiss or stay, no discovery had taken place in the American litigation; the parties filed affidavits supporting their arguments. The district court denied from the bench the motion to dismiss or stay the proceedings. On September 10, 1993, the district court, finding that Turner had a substantial likelihood of success on the merits of its case, granted Turner's motion for a preliminary injunction restraining ARD from telecasting Turner-owned licensed works from the ASTRA satellites. On September 29, 1993, however, the district court granted a stay of the preliminary injunction until October 28, 1993, conditioned on the posting of bond in the amount of $2 million by the appellants. Appellants filed an emergency motion to expedite this appeal and an emergency motion to stay the injunction pending appeal. On October 19, 1993, this court stayed the injunction pending appeal. Appellants challenge the preliminary injunction and the denial of their motion to dismiss or stay the domestic litigation. The stay of the preliminary injunction remains in effect by order of this court.
 
 II. DISCUSSION
 
 25
 A. Whether to Dismiss or Stay the Domestic Litigation: International Abstention
 
 
 26
 ARD appeals the district court's denial of its Motion to Dismiss or Stay the American Litigation in deference to the parallel German proceedings.[6] In the period since the district court denied the appellants' Motion to Dismiss or Stay the American Litigation, the German court has rendered a decision on the merits of the dispute, although it has not determined the fee to be paid by ARD to Turner. The existence of the German judgment adds new considerations to the decision whether to continue the American litigation. The issue is whether a federal court, which properly has jurisdiction over an action, should exercise its jurisdiction where parallel proceedings are ongoing in a foreign nation and a judgment has been reached on the merits in the litigation abroad.[7]
 
 
 27
 Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them. Colorado River Water Conser. Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). Nevertheless, in some private international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction. Therefore, federal courts have begun to fashion principles that guide courts' actions in cases of concurrent jurisdiction in a federal court and the court of a foreign nation. This circuit has never considered the question of "international abstention." In other federal courts, at least two distinct but very similar approaches to international abstention have developed. Both have lifted criteria for analysis from case law concerning concurrent jurisdiction between federal and state courts.
 
 
 28
 One approach has taken the criteria enunciated in Colorado River and applied them to the international context. See Ingersoll, 833 F.2d at 685; Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926-27 (D.C.Cir.1984). These cases have at times injected the special concerns of "international comity"[8] into the abstention analysis. See Ingersoll, 833 F.2d at 685. Another line of international abstention cases, developed in the Southern District of New York, applies a similar set of principles, with a clearer emphasis on the concerns of international comity implicated by the exercise of jurisdiction. See Continental Time Corp. v. Swiss Credit Bank, 543 F.Supp. 408, 410 (S.D.N.Y.1982); Ronar, Inc. v. Wallace, 649 F.Supp. 310, 318 (S.D.N.Y.1986); Caspian Investments, Ltd. v. Vicom Holdings, Ltd., 770 F.Supp. 880, 883-84 (S.D.N.Y.1991). These two sets of principles overlap to a large extent, and we find both lines of cases helpful to our analysis. Taking the two approaches together, courts have sought to fashion principles that will promote three readily identifiable goals in the area of concurrent international jurisdiction: (1) a proper level of respect for the acts of our fellow sovereign nations--a rather vague concept referred to in American jurisprudence as international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources.[9]
 
 1. International Comity
 
 29
 The ramifications of international comity, in the abstention context, are suggested in the leading Supreme Court case, Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895):
 
 
 30
 "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.
 
 
 31
 . . . . .
 
 
 32
 "The comity thus extended to other nations ... is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it as part of the voluntary law of nations."
 
 
 33
 159 U.S. at 163-64, 165, 16 S.Ct. at 143-44 (quoting Bank v. Earle, 38 U.S. (13 Pet.) 519, 589, 10 L.Ed. 274 (1839). The Supreme Court continued:
 
 
 34
 When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, ... and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.
 
 
 35
 159 U.S. at 205-06, 16 S.Ct. at 159-60.
 
 
 36
 In the context of international abstention case law, the meaning of international comity[10] is derived from the above-quoted Supreme Court case on the recognition of judgments rendered in a foreign nation.[11] General comity concerns include: (1) whether the judgment was rendered via fraud, see Hilton, 159 U.S. at 206, 16 S.Ct. at 159; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence, see id.; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just. See id.; Tahan v. Hodgson, 662 F.2d 862, 864 (D.C.Cir.1981); Restatement (Second) Conflict of Laws Sec. 117, comment c.
 
 
 37
 Turner does not argue that the decision was rendered by fraud, or that the German court is not a competent court which follows civilized procedures. Germany's legal system clearly follows procedures that ensure that litigants will receive treatment that satisfies American notions of due process. Turner's sole argument is that the German court's decision is contrary to federal or Georgia public policy because it abrogates Turner's freedom of contract.[12]
 
 
 38
 Turner has proffered a strained interpretation of the German court opinion in an attempt to portray the decision as something akin to a "forced judicial sale" of Turner's property. Turner argues that the Agreement clearly limited ARD's right to telecast to the licensed territory, defined in Paragraph 4 of the Agreement, and that the German court decision would force an unwilling Turner to enter into additional contractual provisions widening the defined territory at a royalty fee to be fixed by the court, all of which Turner argues is directly inconsistent with Paragraph 4 of the Agreement which defines the licensed territory. For the reasons that follow, we reject Turner's characterization of the German opinion, and we reject Turner's argument that the German decision violates American or Georgian public policy.
 
 
 39
 Turner's argument is along the following lines. Although conceding that Georgia law and the general common law of contracts provide for "gap filling" similar to the "supplemental interpretation" employed by the German court, Turner insists that such "gap filling" is impermissible when the result is a provision inconsistent with the provisions of the contract as written.[13] Turner relies upon Higginbottom v. Thiele Kaolin Co., 304 S.E.2d at 365, for this proposition.
 
 
 40
 We conclude, however, that the result of the German court decision is not inconsistent with the Agreement. The Agreement expressly gives ARD a right to telecast "by all means and methods now or hereafter known including but not limited to ... DBS and/or communication satellite for purposes of so-called home television reception." Significantly, the grant also expressly provides that the "telecast can originate any place in the universe for reception only in the Territory as defined in paragraph 4 below (inclusive of legitimate overspill as set forth in p 2(f) below)." Thus, to deny ARD the right to utilize the ASTRA satellite would conflict with the provisions of the Agreement. On the other hand, the German court reasonably concluded that the parties did not contemplate an overspill of the magnitude which results from recent technology, including the ASTRA satellites. Thus, the German court employed its "supplemental interpretation" and filled the gap in the contract in accordance with its determination of good faith dealings by the parties as to unforeseen eventualities. Because we conclude that the utilization of this "gap filling" methodology under these circumstances is consistent with the contract law of both Georgia and the general common law, we reject Turner's argument that the German court decision is in violation of Georgia public policy or in violation of fundamental notions of decency and fairness.
 
 
 41
 Also relevant to considerations of international comity are the relative strengths of the American and German interests. See Ingersoll, 833 F.2d at 685; Ronar, 649 F.Supp. at 318. In the instant case, the contract was written in English, with an American as one party to the contract, and includes a choice of law and forum selection provision designating this federal court and the applicable law (although the choice of law and forum is concurrent with Germany's). However, the central question in the case--whether the Agreement does or should permit ARD to broadcast via ASTRA--requires a thorough knowledge of European broadcasting technology and markets, and requires reference to European law. Most of the witnesses and experts in the litigation would be European. Furthermore, although an American entity is a party to the contract, there also are German parties and the choice of law and forum provisions also designate the German court and law. More importantly, the Agreement calls for performance of the contract, for the most part, in Germany, and the German interest and connection to the case is much more significant than the American.
 
 
 42
 Although Turner attempts to present the case as a garden variety contract action, there are complicated issues surrounding the case that require extensive knowledge of the European television market. Given exclusive jurisdiction over the matter, the federal forum would without doubt be capable of rendering a just result. However, the German court would seem to be the most sensible venue to determine a just result in this case. There appears to be no clear federal interest in trying this case. Certainly much is at stake in this litigation for both parties. However, the public interest in the litigation is more conspicuous in Germany, because the German parties include the German state broadcasters, and the salient issues in the case are of great moment to the state of television in Germany and the rest of Europe. There is no comparable federal interest in maintaining jurisdiction over the litigation.
 
 
 43
 While courts regularly permit parallel proceedings in an American court and a foreign court, see, e.g., Black & Decker Corp. v. Sanyei America Corp., 650 F.Supp. 406, 408 (N.D.Ill.1986), once a judgment on the merits is reached in one of the cases, as in the German forum in this case, failure to defer to the judgment would have serious implications for the concerns of international comity. For example, the prospect of "dueling courts," conflicting judgments, and attempts to enforce conflicting judgments raise major concerns of international comity.
 
 
 44
 In sum, international comity concerns favor deference to the German proceedings in the instant case.
 
 2. Fairness
 
 45
 With respect to the goal of fairness, relevant considerations include: (1) the order in which the suits were filed, see Colorado River, 424 U.S. at 818, 96 S.Ct. at 1246-47; (2) the more convenient forum, id.; see also Ronar, 649 F.Supp. at 318; and (3) the possibility of prejudice to parties resulting from abstention. Ronar, at 318.
 
 
 46
 The instant lawsuits were filed almost simultaneously. The record reflects that the German action was filed one week prior to the American litigation, and the record does not show that the American suit was a reaction to the German suit. We note that none of the cases regarding concurrent international jurisdiction give priority solely on the basis of first-filing in a case where the suits were filed so closely together. See Ingersoll, 833 F.2d at 682 (American suit stayed in favor of Belgian action filed over a year earlier); Continental Time Corp. v. Swiss Credit Bank, 543 F.Supp. at 410 (American litigation dismissed in deference to Swiss action filed six months earlier); Caspian Investments, Ltd. v. Vicom Holdings, Ltd., 770 F.Supp. at 882 (litigation dismissed in deference to Irish action filed over six months earlier). Whatever weight is to be accorded this one-week priority, of course, points toward the German forum. The other factors point even more strongly in that direction.
 
 
 47
 With respect to convenience of the forum, the weightier German interest, discussed above, indicates that the German court provides a more convenient forum for the litigation, as does the fact that most of the witnesses and experts in the litigation would be European, and the fact that the Agreement calls for performance of the contract, for the most part, in Germany. The significantly greater German interest in the litigation, discussed above, also supports the more general notion that concerns of fairness favor the German forum.
 
 
 48
 Before accepting or relinquishing jurisdiction a federal court must be satisfied that its decision will not result in prejudice to the party opposing the stay. See Caspian Investments, Ltd., 770 F.Supp. at 884. Ensuring the ability of the parties to fully and fairly litigate their claims in some tribunal surely is a paramount goal of international abstention principles. See Hilton v. Guyot, 159 U.S. 113, 205, 16 S.Ct. 139, 159, 40 L.Ed. 95 (1895) ("It must, however, always be kept in mind that it is the paramount duty of the court before which any suit is brought to see to it that the parties have had a fair and impartial trial, before a final decision is rendered against either party.") In the instant case, we see nothing that has occurred in the German proceedings to indicate that staying the litigation will foreclose any chance for Turner to obtain a fair and just result. For example, nothing has occurred in the German proceedings to date to dispel the expectation that Turner will have ample opportunity to fairly present to the German trial court at the next stage of the proceedings its evidence regarding the value of the ASTRA broadcasts in the areas outside the licensed territory defined in Paragraph 4 of the Agreement.
 
 
 49
 In sum, we conclude that fairness in this case indicates deference to the German proceedings.
 
 3. Judicial Resources
 
 50
 Finally, courts have considered the efficient use of scarce judicial resources. Criteria relevant to efficiency include (1) the inconvenience of the federal forum, see Colorado River, 424 U.S. at 818, 96 S.Ct. at 1247; Ingersoll, 833 F.2d at 685; (2) the desirability of avoiding piecemeal litigation, Colorado River, supra, Ingersoll, supra; (3) whether the actions have parties and issues in common, see Ronar v. Wallace, 649 F.Supp. at 318; and (4) whether the alternative forum is likely to render a prompt disposition, see id. We have already discussed the convenience of the federal forum. The desire to avoid piecemeal litigation is also relevant to the convenience of the forum. If both proceedings continued, the courts' calendars would have to be synchronized and the litigation would have to move back and forth across the Atlantic. We have already noted that the actions involve substantially the same parties and issues. Finally, the German court would seem as likely as the American forum to render a prompt disposition. Although the appeal of the German decision will not be heard until 1995, the German litigation has moved much farther along than the American action. There has been no discovery in the American litigation, while a trial on the merits has already occurred in Germany. Overall, we readily conclude that concerns regarding judicial efficiency militate strongly in favor of staying or dismissing the instant action in favor of the German litigation.
 
 4. Conclusion on International Abstention
 
 51
 In summary, we conclude that the relevant concerns of international comity, fairness and efficiency point overwhelmingly, at this stage of the litigation, to deference to the German forum which has already rendered a judgment on the merits.
 
 
 52
 We also conclude that at this stage of the litigation, the appropriate resolution is a stay rather than a dismissal of the American action. The German court has yet to rule on appeal or to determine the manner or amount of the fee that the appellants shall pay to Turner. After the German litigation is complete, Turner may seek a hearing to determine whether the final results have altered any issues addressed herein. If not, the action should be dismissed. Either party also may add an action for enforcement of the foreign judgment at an appropriate time.
 
 B. The Preliminary Injunction
 
 53
 The same concerns of international comity, fairness and efficiency, discussed fully above, indicate that it would be inappropriate to enjoin defendants-appellants from telecasting the licensed works or interfere with the ongoing legal proceedings in Germany. Thus, for the same reasons that we have decided to stay the instant suit, we conclude that the preliminary injunction entered by the district court must be vacated.[14]
 
 III. CONCLUSION
 
 54
 For the foregoing reasons, we vacate the judgment of the district court and remand the case to the district court with instructions to vacate its preliminary injunction and stay the litigation.
 
 
 55
 VACATED and REMANDED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 The ASTRA satellites, which include ASTRA 1B and ASTRA 1C, are part of a new generation of satellites that reflect improved broadcasting technology, as discussed below
 
 
 [2]
 Turner's primary place of business is Atlanta, Georgia
 
 
 [3]
 The former East Germany was included in the licensed territory from the inception of the Agreement. It is unclear from the record what degree of influence, if any, reunification had on ARD's increased efforts to reach the former East German population
 
 
 [4]
 In other words, the appellants argued that the Agreement not only provided for legitimate overspill of signals from Turner or its licensees into the licensed territory, but also allowed for ARD's signal to overspill into areas outside the licensed territory
 
 
 [5]
 We note, however, that Turner conceded in the American litigation, contrary to its position in Germany, that the Agreement's provision for legitimate overspill applies reciprocally to ARD and Turner (including Turner's licensees)
 
 
 [6]
 All of the parties to the American litigation are parties in the German litigation. Although some of the parties in the German litigation are absent from this action, the central issue is the same in both cases: whether the Agreement permits ARD to broadcast Turner-licensed works via the ASTRA satellite
 
 
 [7]
 This issue is one of federal law. Ingersoll Milling Machine Co. v. Granger, 833 F.2d 680, 685 n. 1 (7th Cir.1987)
 
 
 [8]
 International comity is discussed below; see n. 10 and accompanying text
 
 
 [9]
 Some courts have added to the consideration of these criteria a general rule that federal courts should assume jurisdiction in parallel proceedings until a judgment is reached in one court. See Laker Airways, 731 F.2d at 926-27, citing Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939) (concerning concurrent jurisdiction in federal and state courts)
 
 
 [10]
 Scholarship on the meaning and proper force of the principles known as international comity is rather sparse and indefinite. One commentator noted, in highlighting the vague meaning of international comity, that comity has been defined in various places as "the basis of international law, a rule of international law, a synonym for private international law, a rule of choice of law, courtesy, politeness, convenience or goodwill between sovereigns, a moral necessity, expediency, reciprocity or 'consideration of high international politics concerned with maintaining amicable and workable relationships between nations.' " Joel R. Paul, Comity in International Law, 32 HVILJ 1, 3-4 and notes 4-14 (1991), quoting Harold Maier, Interest Balancing and Extraterritorial Jurisdiction, 31 Am.J.Comp.L. 579, 589 (1983). Although international comity is a rather nebulous set of principles that may be applicable whenever a court's decision will have ramifications beyond its territorial jurisdiction and into that of another nation, our use of the term is informed and guided by the international abstention case law
 
 
 [11]
 We note that the criteria set out below have been developed for the purpose of considering actions brought to enforce foreign judgments. Although this appeal does not contain an enforcement action, the same criteria are readily applicable in the present context because a judgment has been rendered in the parallel proceeding
 
 
 [12]
 As noted, supra, n. 7, the abstention question is a matter of federal law. Thus, in determining whether the German decision is contrary to the policy of freedom of contract, we look to general common law on contracts. However, actions to recognize and enforce foreign judgments in diversity cases are matters of state law. See Ingersoll, 833 F.2d at 686-89 (holding that Belgian judgment should be enforced because it was not contrary to Illinois contract law); Restatement (Second) Conflict of Laws Sec. 117, comment c. Thus, the foreign judgment must not abridge state policy if a prevailing party is to obtain enforcement of a foreign judgment in a domestic court. Because the question before us is so similar to an enforcement action, we also examine the German decision in light of Georgia law on contracts. If the German decision were contrary to Georgia policy, we assume, arguendo, that it would be unenforceable
 
 
 [13]
 Indeed, before the German court, Turner invited the court to use supplemental interpretation to fill any gaps that existed in the contract. It is clear that the doctrine of good faith and the use of supplemental interpretation to reach a result consistent with the result that would be reached by parties bargaining in good faith is a common feature of American contract law. See, e.g., Market Street Associates Ltd. Partnership v. Frey, 941 F.2d 588, 595 (7th Cir.1991) ("The concept of the duty of good faith ... is a stab at approximating the terms that parties would have negotiated had they foreseen the circumstances that have given rise to their dispute.") This is exactly what the German court did in employing supplemental interpretation as a device to implement the German doctrine of good faith
 Of course, Turner was not the original party to the Agreement; the Agreement was one of the obligations Turner assumed when it purchased portions of the MGM library. Given the fact that Turner, unlike MGM/UA, is itself a broadcasting company with the capability to broadcast licensed works via ASTRA, Turner may very well wish that the Agreement had never been consummated. However, Turner assumed the obligation to honor the contract in good faith upon purchasing the works covered by the Agreement.
 On the obligations that accompany contracts, the Market Street court stated that "[t]he parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract." 941 F.2d at 595. A court's purpose is to uphold the "overriding purpose of contract law, which is to give the parties what they would have stipulated for expressly if at the time of making the contract they had complete knowledge of the future and the costs of negotiation and adding provisions to the contract had been zero." Id. at 596. We see nothing within the German doctrine of good faith or the supplemental interpretation device that strays from this purpose.
 Furthermore, Georgia has long recognized the duty of good faith among contracting parties, and the necessity to supplement implied terms on rare occasions. See, e.g., Kleiner v. First Nat. Bank of Atlanta, 581 F.Supp. 955, 960 n. 5 (N.D.Ga.1984) ("Under Georgia law, good faith is an element of every contract."); Higginbottom v. Thiele Kaolin Co., 251 Ga. 148, 304 S.E.2d 365, 366 (1983) (Courts "will imply promises or duties when justice, good faith, or fairness so demand.").
 
 
 [14]
 Because the German judgment on the merits occurred after the district court acted, thus substantially changing the relevant circumstances, we need not consider whether the district court erred in granting a preliminary injunction in light of the facts then before it and the posture of the litigation at that time