**In re REGUS BUSINESS CENTRE CORP., et al., Debtors.**

**Nos. 03–20026 (ASH) to 03–20029(ASH).**

United States Bankruptcy Court, S.D. New York.

Nov. 6, 2003.

Pillsbury Winthrop LLP, By Karen Dine, Esq., New York City, for Debtor.

Kaye Scholer LLP, By Richard Smolev, Esq., Steven Wirth, Esq., New York City, for Official Committee of Unsecured Creditors.

Thacher Proffitt & Wood LLP, By Christopher Graham, Esq., White Plains, NY, for National Westminster Bank, PLC.

### DECISION ABSTAINING ON THE CREDITORS' COMMITTEE'S OBJECTION TO NATIONAL WESTMINSTER LEGAL FEE OFFSET

ADLAI S. HARDIN, JR., Bankruptcy Judge.

Before me is the objection of the Official Committee of Unsecured Creditors in these jointly administered Chapter 11 cases to the legal fees of two sets of attorneys in London and New York for National Westminster Bank, PLC which had been billed to and paid by National Westminster. The legal fees to which the Committee objects aggregate approximately $211,000 accrued from mid-January 2003, when the debtors filed for bankruptcy, through July 23, 2003. The full amount of these fees was set off by National Westminster against two accounts maintained by debtor Regus PLC in accordance with a stipulation so ordered by this Court on June 26, 2003, which I shall refer to as the "Set–Off Stipulation." Regus PLC is an English corporation headquartered in Surrey, England and is the ultimate parent corporation of Regus Business Centre Corp. and the other debtors in this case.

■ This Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by acting Chief Judge Robert J. Ward. This is a core proceeding under 28 U.S.C. § 157(b).

There are sharp differences of fact between the Committee and National Westminster concerning the negotiations and proceedings between the parties during the period from January through July 2003 when the legal services in question were rendered. But there is no dispute over the underlying facts giving rise to the controversy.

The debtors are said to be the largest worldwide operator of "Executive Suite" business office accommodations, operating a global network of over 420 fully-serviced business centers located in more than two hundred cities around the world. In connection with their business center leases, the debtors were often required to provide stand-by letters of credit to their landlords. The majority of letters of credit were issued by JP Morgan Chase Bank, which I shall refer to as "Chase." Pursuant to agreements between Chase and Regus Business Centre Corp. and Regus PLC, Chase issued irrevocable stand-by letters of credit for the account of the Regus entities in favor of various landlords, as beneficiaries, with whom Regus Business Centre Corp. did business. In connection with the issuance of these letters of credit, Regus Business Centre Corp. executed various indemnity and reimbursement agreements in favor of Chase in the event the letters of credit were drawn down and were paid by Chase. The payment and reimbursement obligations of Regus Business Centre Corp. to Chase with respect to the letters of credit were

supported by security in various forms given in favor of Chase. Included in such security was a guarantee of payment issued by National Westminster in favor of Chase, which I shall refer to as the "National Westminister Guarantee."

The National Westminster Guarantee, assuring Chase of repayment on the Chase letters of credit, was in turn backed by the contractual obligation of and security provided by the debtor parent corporation, Regus PLC. On July 8, 2002 Regus PLC executed a "Charge of Deposit with the Bank" in favor of National Westminster, which I shall refer to as the "Charge". The Charge provided a right of set-off against any deposit or credit balance in any account of Regus PLC with National Westminster. The Charge was duly filed on July 18, 2002 with the Registrar of Companies for England and Wales which issued a Certification of registration of the Charge covering all deposits in two specified accounts of Regus PLC with National Westminster, referred to as the "Pledged Accounts". Further, on September 3, 2002 Regus PLC executed a "Specific Deed of Counter Indemnity" to indemnify National Westminster for any payments, together with interest, fees, costs, attorneys' fees and expenses arising pursuant to the National Westminster Guarantee in favor of Chase. The Regus PLC Charge and Counter Indemnity in favor of National Westminster each states that it shall be governed by and construed in accordance with the laws of England.

Subsequent to the debtors' January 14, 2003 filing date, Chase made demands under the National Westminster Guarantee which were paid by National Westminster aggregating $10,564,394. That amount, together with interest, fees, costs, attorneys' fees and expenses (referred to in the Set–Off Stipulation as the "Fixed and Matured Amount"), became the obligation of Regus

PLC to National Westminster pursuant to the Counter Indemnity and was secured by the Pledged Accounts in accordance with the Charge. National Westminster desired to be paid the Fixed and Matured Amount in accordance with the Regus PLC Counter Indemnity but was barred from offsetting the Fixed and Matured Amount against the Regus PLC Pledged Accounts by reason of the automatic stay. After lengthy negotiations on a variety of issues and alternative proposals, debtor Regus PLC ultimately agreed to acquiesce in full payment to National Westminster of the Fixed and Matured Amount by set-off against the Pledged Accounts. The parties by counsel executed the Set-off Stipulation which, upon Bankruptcy Court approval, lifted the automatic stay to allow National Westminster to set off against the Pledged Accounts the Fixed and Matured Amount as well as future obligations of Regus PLC to National Westminster under the Counter Indemnity as such obligations become due and payable without further order of the Bankruptcy Court.

The Fixed and Matured Amount included the $211,000 of attorneys' fees to which the Committee has objected as permitted under the Set–Off Stipulation.

Subsequent to the October 22 hearing on this matter, I have thoroughly reviewed the Objection of the Committee dated September 19, 2003, the Response of National Westminster dated October 15, 2003, and Exhibits D, E, F, G, H, I and J annexed to the October 15, 2003 affidavit of Christopher Graham. In particular, I have examined the "Summary of Legal Tasks Performed," the "Task Summary," and the detailed billing statements associated with each contained in Exhibit H, and I have studied the "Opinion" of Nicholas Bacon dated October 13, 2003 attached to the Graham Affidavit as Exhibit D.

█ I have also given careful consideration to point I in the Response of National Westminster which argues that this Court should abstain from hearing the Committee's Objection on the grounds of international comity and the presumption against extraterritorial application of United States law. While I do not believe that *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036 (2d Cir. 1996) requires dismissal of the Committee's Objection, or that either comity or the so-called presumption against extraterritorial application of United States law mandates abstention here, it is my conclusion that abstention is an appropriate exercise of discretion on the particular facts before me.

In *Maxwell*, three European Banks (the "banks") made transactions with the debtor during the preference period. When the debtor filed under the Insolvency Act in England and under the Bankruptcy Code in the United States, one of the banks sought relief in the English courts, enjoining the administrators appointed by the English High Court from filing preference actions in the Bankruptcy Court in New York. The English court declined to grant such relief, leaving it to the U.S. judges to decide the issue of the international reach of the U.S. preference law. After the abstention by the English courts, the administrators were free to and did bring preference actions in the U.S. The banks moved for dismissal under the doctrine of international comity and the presumption against extraterritoriality. The U.S. Bankruptcy Court ruled in favor of

the banks, stating that "the presumption against extraterritoriality precludes" the actions and "considerations of comity dictate" the dismissal because "England has the greater interest in applying its law." *Maxwell Communication Corp. plc v. National Westminster Bank plc*, 170 B.R. 800, 818 (Bankr.S.D.N.Y.1994). The District Court affirmed. The Second Circuit also affirmed, holding that where there is a case "involving cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws for the common benefit of creditors, the doctrine of international comity precludes application of the American avoidance law to transfers in which England's interest has primacy." *Maxwell*, 93 F.3d at 1055.

█ National Westminster argues that under *Maxwell* this Court should dismiss the Committee's objection at issue under the doctrine of international comity because the transaction is predominately English. Comity has been defined as voluntary "recognition" of foreign "legislative, executive or judicial acts."[1] *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895); Franklin, TaeRa K., *The Formation, Evolution, and Application of the Bremen Standard: The New Federal Common Law Approach to Choice of Forum and Law Clauses in International Contracts*, 7 N.Y.ST.B.A. N.Y. BUS. L.J. 22, 23 (Summer 2003). Under the comity doctrine nations recognize foreign laws in their jurisdiction out of "grace," not as an "obligation." *United States v. Nippon Paper Industries Co., Ltd.*, 109 F.3d 1, 8 (1st Cir.1997) ("Comity is more an aspiration

---

**1.** This definition reflects the following sentiment expressed by Justice Story:

> The true foundation on which the administration of international law must rest is that the rules which are to govern are those which arise from mutual interest and utility, from a sense of the inconveniences

which would result from a contrary doctrine, and from a spirit of moral necessity to do justice, in order that justice may be done to us in return.

*See* Franklin, *supra*, 23 (citing Story, Joseph, *Commentaries on the Conflict of Laws* (1st ed. 1834)).

than a fixed rule, more a matter of grace than a matter of obligation"); *see also* Franklin *supra,* 23.

■ Nowhere in *Maxwell* does the Second Circuit state that under the doctrine of international comity a U.S. bankruptcy court must dismiss a claim involving a "predominately foreign transaction." Further, although "international comity" may be relevant in determining whether a court "should decline to exercise jurisdiction or as a tool for ascertaining the scope of jurisdiction in the first place," *Maxwell,* 93 F.3d at 1047 (citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 797–99 & nn. 24–25, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)), determining "whether to abstain from a case on the basis of international comity is a matter within the discretion of the [federal] district court...." *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002).

The starting point for analysis is the fact that both parties at issue here, Regus PLC and National Westminster, are English corporations with their headquarters in Surrey and London, respectively. The transaction was negotiated in England. The governing legal instruments, the Counter Indemnity and the Charge, were prepared by English counsel and are governed by English law. The Pledged Accounts, which are the subject of the Charge and against which the legal fees in question were set off, are in England. The Charge became effective upon filing with the Registrar of Companies for England and Wales. In short, this was an English transaction entered into by English parties with the reasonable expectation that their rights and obligations would be construed and enforced under English law.

■ In international contracts, the choice of law and forum clauses generally will be given effect in our courts unless any of the four conditions is present: (1) the clauses are the "result of fraud or overreaching;" (2) the chosen forum is gravely inconvenient or unfair; (3) "the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy;" or (4) the clauses "contravene a strong public policy of the forum state." *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir. 1993) (internal quotations omitted). *See also Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12–16, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (holding that forum and law selection clauses are *prima facie* valid if (1) the parties' choice is not a product of "fraud, undue influence, or overweening bargaining power;" (2) the choice is not "unreasonable and unenforceable if the chosen forum is *seriously* inconvenient for the trial of the action;" and (3) enforcement would not "contravene a strong public policy of the forum in which suit is brought"); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (The Supreme Court stated that it would be against public policy if the choice of forum and law clauses together act as a "waiver" of statutory remedies under the forum in which the suit is brought, *i.e.,* inadequate remedies available under the chosen forum and law).

In this case the parties, both English, did not designate the forum for resolving disputes in their contracting documents, although one must assume that the expectation was that any controversy would be resolved in an English court.[2] But the

---

**2.** The choice of law clause in the National Westminster Guarantee in favor of Chase, an American bank (Exhibit A to Christopher F. Graham's Affidavit), also includes a choice of forum provision, stating "8. This guarantee is governed by and construed in accordance

authorities discussed above set the same fundamental test for choice of law as choice of forum. *Bremen* involved the choice of forum; however, the Supreme Court stated that the parties' choice of forum included choice of law because of the English presumption that "the parties are assumed, absent contrary indication, to have designated the forum with the view that it should apply its own law." *Bremen*, 407 U.S. at 14 n. 15, 92 S.Ct. 1907. *Mitsubishi* involved both forum and law selection clauses. In *Roby* the Second Circuit held that choice of law and forum clauses are *prima facie* valid if they met the *Bremen* test. *Roby*, 996 F.2d 1353 at 1363.

Applying these standards to the case at hand, there is no claim of fraud, undue influence or overweening bargaining power. The English forum is not "seriously inconvenient." Nor is there any suggestion that the Committee would not have an adequate remedy under English law or that applying English law would conflict with public policy as reflected in the Bankruptcy Code or otherwise.

Indeed, the law articulated in the cases under Section 506(b) of the Bankruptcy Code relied upon by the Committee is remarkably similar to English law with respect to the allowance of legal fees. Both U.S. and U.K. laws recognize that legal fees to be imposed upon an adversary or a counter-party to a transaction must be judged under a test of "reasonableness." As explained in the lucid expert Opinion of Nicholas Bacon, Esq., "English law recognizes two basis' for the quantification or assessment of costs: the Standard Basis and the Indemnity Basis." The definitions of these terms are set forth in Rule 44.4 of the Civil Procedure Rules of 1998, apparently codifying case law. After identifying these two bases, Rule 44.4(1) continues

"... but the court will not in either case allow costs which have been unreasonably incurred or are unreasonable in amount." The distinction between "standard basis" and "indemnity basis" is not found in American law, and application of the "indemnity" standard arguably might result in a different determination of reasonableness than under American case law. But it has not and cannot be suggested that English law on the point conflicts with public policy as reflected in the Bankruptcy Code or U.S. case law. Accordingly, were I to retain jurisdiction over the controversy, it would be my decision to resolve it in accordance with English law as provided by the parties in the Counter Indemnity and the Charge.

■ The same considerations inform my decision on the question of discretionary abstention under 28 U.S.C. § 1334(c)(1). Federal courts have the "inherent, discretionary power to abstain from exercising that jurisdiction in order to extend comity to related proceedings pending in other countries." *United Feature Syndicate*, 216 F.Supp.2d at 210. In certain "international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction." *Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir.1994). Though 28 U.S.C. § 1334(c)(1) provides abstention in interest of justice or out of comity with state courts and state forum, "it does not follow that Congress would expressly allow the federal district courts to defer by abstention to state courts in the interest of justice [or comity], but would at the same time implicitly divest them of their inherent power to abstain when the interest of justice [or comity] would be served ... in a foreign tribunal where the action arose." *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 833

with the laws of England and the courts of England have exclusive jurisdiction to settle

any dispute arising out of or in connection with this guarantee."

(5th Cir.1993) (in context of parallel proceedings).

There is no suggestion that the Committee's objection to the National Westminster attorneys' fees cannot be completely and timely resolved in the English courts. Mr. Bacon advises in his Opinion that:

> The English Court has jurisdiction to quantify the amount of costs payable under both the Charge and the [Counter] Indemnity. It may do so under its inherent jurisdiction as well as pursuant to such statutory provisions and rules as may apply to a particular case. This process of quantification, known as assessment (formerly Taxation), takes place not only in respect of litigation costs but also in respect of non-litigation costs arising under contracts of the sort with which we are here concerned. The rules of court provide the machinery for quantification. They provide, in particular, for accounts to be taken and inquiries to be made. They also provide for costs to be assessed by Costs Judges. A special cadre of judicial officers, the Costs Judges (sometimes also referred to as Taxing Masters of the Supreme Court), has been established to carry out this process.

As a general rule the federal courts should exercise the jurisdiction "conferred upon them by Congress," *United Feature Syndicate*, 216 F.Supp.2d at 210, and should not abstain from resolving disputes fairly presented, particularly where abstention might result in delay of bankruptcy proceedings or other prejudice to parties in interest. In this case, however, no compelling reason appears for this Court to retain jurisdiction over a dispute between English parties with respect to property situated in England which must be resolved under English law and can be resolved promptly and fully by an English court which specializes in the resolution of such disputes.

Therefore, the Court will exercise its inherent and discretionary power to abstain from resolving the issue at hand out of "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of international commercial system for predictability in the resolution of disputes." *Mitsubishi*, 473 U.S. at 629, 105 S.Ct. 3346; *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *see also Roby*, 996 F.2d at 1363 ("[I]international comity dictates that American courts enforce [forum and law selection clauses] out of respect for the integrity and competence of foreign tribunals").

Counsel for National Westminster will prepare an appropriate order consistent with this ruling and submit it to the Court for signature after obtaining approval as to the form of the order from counsel for the Committee and the debtors.